UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| SOVEREIGN HOLDINGS, INC., | 4:17-CV-04105-KES |
| Plaintiff, | |
| vs. | ORDER GRANTING IN PART AND DENYING IN PART MOTION TO COMPEL |
| PAUL W. DECK, JR. and SCOTT A. HINDMAN, | |
| Defendants, | |
| and | |
| MARY ELLEN KISTING, | |
| Interested Party. | |

Plaintiff, Sovereign Holdings, Inc., moves to compel defendant Paul W. Deck, Jr., to produce documents associated with Deck's representation of Sovereign during previous litigation. Docket 42. Deck opposes the motion, arguing that the documents are privileged because they contain confidential communications between Deck and Mary Ellen Kisting, the former president and 75% owner of Sovereign, when Mark Nylen, the current owner of Sovereign, was adverse to Sovereign. Docket 56. Following a telephonic hearing on the motion (Docket 70), Deck produced the documents identified in his privilege logs to the court for an in-camera review. On May 1, 2018, the court held an evidentiary hearing on the merits of Sovereign's motion to compel. Docket 81. The court permitted Sovereign, Deck, and Kisting, an interested

party, to submit supplemental briefing following the hearing. *See* Dockets 89, 92, 94, 95, 97. For the reasons that follow, the court grants Sovereign's motion in part and denies Sovereign's motion in part.

## BACKGROUND

Sovereign Holdings was incorporated as a South Dakota corporation in 2007 by Mary Ellen Kisting, formerly Mary Ellen Nylen.[1] Docket 57-1, Docket 81 at 20. Kisting created Sovereign from the assets of a previous company she owned, and she ran the business with her husband at the time, Mark Nylen. Docket 81 at 20-21. Kisting was a 75% shareholder, president, and treasurer of Sovereign until June 21, 2017. *Id.* at 23. Nylen was vice president and secretary of Sovereign until March 2015, and, as trustee for two family trusts, was a 25% shareholder until June 21, 2017. *Id.*; Docket 57-2.

Sovereign's primary assets consisted of transportation equipment, such as an airplane,[2] semi-trucks, tankers, and some processing equipment. Docket 81 at 21. Kisting and Nylen also started Hepar BioScience, LLC,[3] which was a company that bought and sold animal by-products. *Id.* at 22. Sovereign leased

---

[1] The facts are derived from the March 7, 2018 telephonic hearing, May 1, 2018 evidentiary hearing, the parties' submitted briefs, attachments, and the memorandum decisions and other filings from the dissolution court in *Nylen v. Nylen*, that were submitted to the court under a protective order (Docket 22) and supplemental protective order (Docket 69).

[2] Kisting testified that the airplane was owned by Hepar LLC, a holding company created to keep insurance liability of the assets separate. While she mentioned that Sovereign owned Hepar LLC, Kisting did not detail when Hepar LLC was created or when the airplane was transferred to Hepar LLC. *See* Docket 81 at 29.

[3] Kisting was a 99% shareholder and Nylen a 1% shareholder in Hepar BioScience, LLC. Docket 81 at 22.

its transportation equipment and airplane to Hepar BioScience to transport Hepar BioScience's by-products. *Id.* Sovereign employed two truck drivers as its only employees and did not lease its equipment to any company other than Hepar BioScience. *Id.* at 22-23.

In December 2011, January 2012, and May 2013, Sovereign guaranteed Hepar BioScience loans from Northwest Bank, formerly known as First National Bank. Docket 57-7. The guaranties were signed by Mark Nylen as vice president and secretary of Sovereign. *Id.* Kisting testified she "found out afterwards," sometime in 2011 or 2012 that Sovereign had guaranteed a loan of Hepar BioScience. Docket 81 at 24-25. Nylen also personally guaranteed the Hepar BioScience loans, but Kisting did not. Docket 57-5; Docket 81 at 26.

On January 1, 2014, Nylen filed for divorce from Kisting. Docket 81 at 24. In May 2014, Nylen sent Kisting a letter notifying her that Hepar BioScience was discontinuing its lease of the equipment from Sovereign and would no longer do business with Sovereign. Docket 57-6. As a result, Sovereign no longer received income and did not have the money to maintain the transportation equipment. Docket 81 at 34. Kisting testified that Nylen, as part of the dissolution proceeding, proposed selling the Sovereign assets. *Id.* at 34-35. But because Northwest Bank used Sovereign's assets to guarantee its loan, Kisting was worried that Northwest Bank would come after the proceeds of the assets once Sovereign sold them. *Id.* at 35. The bank represented that it agreed to the sale and waived any interest it may have in the proceeds, so Kisting agreed to sell the airplane and other equipment. *Id.* at 104-05.

The proceeds of the airplane and other transportation equipment, which totaled approximately $10 million, were ultimately placed in a marital escrow account. Docket 81 at 38-39. At some point the dissolution court ordered the proceeds to be transferred back to Sovereign's account. *Id.* at 39-40. Kisting contested the transfer through "both" her divorce attorneys and Deck. *Id.* at 40.

> Q. When you say "both," what do you mean?
>
> A. I contacted Mr. Deck. Because he was the one that was involved, too, with getting the release from the bank to not get those proceeds. So it was – no, he did not appear in front of Judge Jensen, but I contacted him, and I contacted my attorneys who appeared before Judge Jensen.
>
> Q. So you spoke to both your personal divorce attorneys and spoke to Mr. Deck who was still representing Sovereign at that time?
>
> A. Correct.

*Id.* at 40:10-20.

Deck testified that as general counsel for Sovereign, he advised on whether Northwest Bank waived its claim to the proceeds of Sovereign's airplane sale. *Id.* at 97. He also advised that he believed the bank waived its claim when the bank agreed to the transfer of the proceeds out of the Sovereign account to the marital escrow account. *Id.* Deck believed his communications with Kisting, as president of Sovereign, were privileged because:

> [a]t the time I didn't know whether or not [Kisting] was going to retain – what the divorce court was going to do. But it was obvious that if the divorce court gave the company to her former husband, given the animosity that was between the two, that it was a very hostile relationship, and a severing of that relationship, that my communications with her would have to be privileged.

*Id.* at 98:17-24.

After the proceeds were transferred to Sovereign's account, Northwest Bank tried "to seize that account." *Id.* at 40:21-24.[4] Northwest Bank sued Sovereign, Hepar LLC, and Kisting for the outstanding debt as provided in the loan guarantees. *See Northwest Bank v. Sovereign Holdings, Inc. et al.*, CV 15-4066. Kisting retained Paul Deck and Scott Hindman to represent Sovereign in the lawsuit brought by the bank. Docket 81 at 41.[5]

Northwest Bank dismissed the claims against Hepar LLC and Kisting, but continued with its claim against Sovereign. *See* CV 15-4066 Docket 38. In February 2016, the court granted Northwest Bank's motion for partial

---

[4] The sale of Sovereign's assets, particularly the airplane, resulted in significant tax liabilities for Kisting as the 75% owner of an S corporation. *See* Docket 92 at 5-6; Nylen Divorce 0056 (dissolution court memorandum decision dated 12-07-15). Kisting also owed interest and late filing penalties. *Id.* In a memorandum decision, the dissolution court granted Kisting's request to release approximately $5.2 million to pay her tax liabilities, plus an additional $400,000 to pay Kisting's interest and penalties. *Id.*

After the taxes and penalties, approximately $5 million remained in Sovereign's account, which is the money Northwest Bank tried to seize. Docket 81 at 57.

[5] Deck was general corporate counsel for Sovereign during this time, but Scott Hindman was litigation counsel for the Northwest Bank lawsuit against Sovereign. Docket 81 at 105-06. Deck never appeared in *Northwest Bank v. Sovereign*, but Hindman kept Deck informed on the status of the litigation. *Id.* at 160. Deck also stated: "I communicated quite often. I primarily was the communicator with [Kisting], and then I would confer with Scott Hindman, who was the litigation counsel. Scott also communicated some directly with [Kisting]." *Id.* at 108:25-109:3.

summary judgment against Sovereign on a claim for breach of contract. CV 15-4066 Dockets 59, 61.[6]

Deck has known Kisting and Nylen since 2012 or 2013 when he began representing Hepar BioScience in corporate filing matters. Docket 81 at 92. He represented Kisting personally in a guardianship matter in late 2013 and aided her with a will at some later date. *Id.* at 92-93. He also represented Nylen personally, jointly with Kisting, regarding a real estate matter, and other miscellaneous property disputes or small matters. *Id.* at 93-94.

Deck never represented Kisting in the divorce proceedings. *Id.* at 95. Deck was general counsel for Sovereign from 2012 or 2013 until 2017. *Id.* at 95. While he initially represented the other companies, he disassociated himself with Nylen and Hepar BioScience after the divorce proceedings began. *Id.* at 96. Deck, aware that Sovereign was deemed a marital asset by the dissolution court, testified that "[w]hat was done in the divorce court affected Sovereign Holdings corporate, so I had to deal with those issues." *Id.* at 97:6-8.

Kisting gave her divorce attorneys permission to contact Deck to discuss issues involving both Sovereign and the divorce "[b]ecause Sovereign Holdings was a marital asset in the divorce." Docket 81 at 42:22-23. Under Kisting,

---

[6] Meanwhile, the dissolution court ordered 25% of Sovereign's remaining balance to be paid to the Nylen trusts for the trusts' interest in Sovereign. Docket 81 at 56. Additionally, Nylen personally owed $6 million to Sovereign, so the dissolution court ordered that 25% of his debt must be paid to the trusts. *Id.* In total, Nylen owed the trusts approximately $2.75 million for the trusts' 25% ownership interest in Sovereign ($1.25 million + $1.5 million). *Id.* at 57. Thus, after seizing the $5 million, Northwest Bank paid $2.75 million to the trusts and applied the remaining balance to Hepar BioScience's debt. *Id.*

Sovereign's position was to keep the money in Sovereign's account rather than allow Northwest Bank to reduce Hepar BioScience's debt. *Id.* at 43.

> Q.   So you were trying to keep that money from the bank?
>
> A.   I was trying to keep from Mark Nylen having the bank seize the money.
>
> Q.   Why would Mark Nylen want the bank to seize the money?
>
> A.   To reduce down the loan for the Hepar BioScience loan.
>
> Q.   Did you feel Mr. Nylen's interests with regard to that money that was sitting in the Sovereign Holdings' bank was adverse to Sovereign Holdings' interests?
>
> A.   Correct.

*Id.* at 43:14-25.

And Deck testified:

> A:   Basically we were trying to figure out a way so the bank couldn't get the $5 million.
>
> Q:   Did you think that was consistent with the interests of Sovereign Holdings?
>
> A:   It would have been consistent with the interests of those that owned Sovereign Holdings.
>
> Q:   And Sovereign Holdings itself?
>
> A:   Sovereign Holdings itself.

*Id.* at 109:4-11.

Deck also communicated with Kisting and her divorce attorneys about Sovereign's defense to the Northwest Bank lawsuit. *Id.* He believed such communication was necessary because Sovereign was a marital asset and "Judge Jensen ultimately was doing things in the divorce that I needed to be

kept abreast of and apprised of." *Id.* at 110:1-3. When asked if he viewed Sovereign's interests in the bank litigation as adverse to Nylen's interests, Deck responded "[a]bsolutely." *Id.* at 110:9.

Kisting, as the president of Sovereign, approached Deck for the purpose of seeking legal advice. Docket 81 at 53. *See also id.* at 112 (Deck testifying that he provided legal advice to Kisting as president of Sovereign). Kisting believed her conversations with Deck, as president of Sovereign, were confidential. *Id.* at 44. She communicated with Deck to obtain legal advice in her role as president of Sovereign. *Id.* at 45.

> Q.   And as far as personal legal advice related to your divorce, you would contact your own divorce attorneys. Is that true?
>
> A.   Yes.
>
> Q.   So as far as the advice you were seeking from Mr. Deck, that was advice you were seeking wearing your hat as President of Sovereign Holdings. Is that true?
>
> A.   Yes.
>
> Q.   Again, if you needed advice related to the divorce, you would go to your divorce attorneys?
>
> A.   Correct.

*Id.* at 53:8-18.

Deck's testimony was largely similar to Kisting's testimony. While Kisting was still the 75% shareholder of Sovereign, he did not represent Kisting personally, but "[a]s it turned out, her personal interests, as an officer of Sovereign, merged with the interests of the company as it went forward." *Id.* at 130:12-14. Additionally, Deck testified:

A: Right. But did I ever represent [Kisting] personally? No. In that regard, no.

Q: As to her personal interest in Sovereign, there was no personal representation by you of [Kisting]. Correct?

A: I think I've already answered that question.

Q: And you said that you agreed with that. You didn't get involved on her behalf personally. Correct? You represented the company.

A: I represented the company, and her as an officer of the company, yes.

Q: In her role as a majority owner, president, and board member.

A: Yes, and her personal interests in the company was [sic] left to the divorce attorneys.

*Id.* at 131:1-15.

Kisting only disclosed her conversations with Deck to her attorneys and her accountant. *Id.* at 44. And she believed her personal interest aligned with Sovereign's interest—namely, keep the bank from acquiring the money— "[b]ecause it was going to go to Mark Nylen personally to bring down the debt of Hepar BioScience" and reduce his personal guaranty obligations. *Id.* at 44:20-21. She kept Deck informed of events occurring in the divorce related to the corporations and the corporations' assets so Deck could adequately represent Sovereign. *Id.* at 46. She believed it was "necessary" for Deck to "have knowledge of the divorce proceedings related to Sovereign" because Sovereign was a marital asset. *Id.* at 50-51. And when asked if her communications with Deck "concern[ed] matters with regard to the general affairs of Sovereign

Holdings[,]" Kisting said yes. *Id.* at 54:25-55:3. In addition, Deck's testimony indicated that his communications with Kisting's divorce attorneys were related to his work for Sovereign. *Id.* at 132.

Regarding Deck's attorney's fees, Kisting testified:

> Q.     Who paid Mr. Deck's attorney's fees?
>
> A.     I did.
>
> Q.     Was that something that was reimbursed from the marital account, or did you pay those personally?
>
> A.     When there was money in the marital escrow account, Judge Jensen let us use that money to pay attorney's fees. But in the Sovereign Holdings lawsuit with the bank, I asked Judge Jensen if I could be reimbursed for all of those expenses, and he said no. So I personally paid all of Sovereign Holdings' legal fees.

*Id.* at 51:17-52:2.

When questioned on attorney's fees further on cross-examination, Kisting testified:

> Q.     Correct. Fair to say that before the divorce, going back before the divorce, any legal fees pre-2014, legal fees were paid by Sovereign and/or Hepar?
>
> A.     Yes. I would pay either out of Sovereign's bank account or Hepar BioScience's bank account.
>
> Q.     Once the divorce started, and Hepar and Sovereign were both determined to be marital assets, they fell under Mr. Bieber's[7] control as a receiver?
>
> A.     Not right away, no.
>
> Q.     At some point in time?
>
> A.     Yes.

---

[7] Mr. Bieber was appointed as the receiver in the dissolution proceeding, where he processed and handled bills for Nylen and Kisting. *Id.* at 78-79.

Q.      And Mr. Bieber was in charge of making those payments?

A.      For us personally, yes.

*Id.* at 79:3-16.

The dissolution court issued a memorandum opinion on December 18, 2015, which concluded that many of Kisting's communications with Deck were protected under the attorney-client privilege or work product doctrine. Docket 90-1, at Nylen Divorce 000019. The privilege log submitted to and reviewed by the dissolution court listed communications between Kisting or her divorce attorneys and Deck up until July 12, 2015. *Id.* at 000036. The dissolution court further found that Kisting had not expressly or impliedly waived that privilege. *Id.* at 000021.

On April 5, 2016, the dissolution court orally announced that as part of the divorce proceedings, Kisting would be ordered to transfer her 75% interest in Sovereign to Nylen. Docket 90-5, at Nylen Divorce 000629. Kisting conveyed the dissolution court's order to Deck. Docket 81 at 115. On April 13, 2017, the dissolution court entered a supplemental judgment regarding property division, which incorporated the order that Kisting's 75% ownership interest in Sovereign be transferred to Nylen. Docket 90-10. On June 21, 2017, Kisting transferred her 75% interest to Nylen, and Nylen and the trusts continue to own Sovereign today. Docket 81 at 61.

Deck testified that he stopped representing Sovereign at the end of June 2017, but he continued to communicate with Kisting after ending his

representation of Sovereign. *Id.* at 113. When asked why such communications were necessary, Deck stated:

> A: Hepar Bio, through Troy Heitman, made a written demand, as well as verbal demands, for my entire Sovereign Holdings file while I was representing that company, and, in particular, the bank litigation file. We corresponded. Basically I said no.

*Id.* at 116:23-117:2.

On July 11, 2017, the dissolution court held a hearing to handle motions related to the dissolution. Docket 78-1. At this hearing, the parties also discussed an authorization that Nylen wanted Kisting to sign to allow third parties to turn over their Sovereign files to Nylen. *Id.* After discussion, the dissolution court did not require Kisting to sign the proposed authorization. *Id.*

In its motion to compel here, Sovereign seeks 1,084 documents. Docket 70 at 3. Deck and Kisting oppose Sovereign's motion to compel on a number of grounds, but they generally argue that the documents sought by Sovereign contain attorney-client communications subject to Kisting's personal privilege.

## LEGAL STANDARD

Federal Rule of Civil Procedure 26 governs the scope of discovery in civil matters, providing:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). If a party does not produce requested documents, the party seeking discovery requests may move for an order compelling production. *See* Fed. R. Civ. P. 37(a)(3)(B).

The scope of discovery under Rule 26(b) is extremely broad. *See* 8 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2007 (3d ed. 2015). The reason for the broad scope of discovery is that "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession." 8 Wright & Miller § 2007 (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947)). The federal rules distinguish between discoverability and admissibility of evidence. *Christensen v. Quinn*, 2013 WL 1702040, at *4 (D.S.D. Apr. 18, 2013). Thus, the rules of evidence assume the task of keeping out incompetent, unreliable, or prejudicial evidence at trial. But these considerations are not inherent barriers to discovery. *Id.*

## DISCUSSION

In diversity actions, a federal court must apply federal law to determine work-product claims and state law to determine the existence and scope of attorney-client privilege. Fed. R. Evid. 501; *Baker v. General Motors Corp.*, 209 F.3d 1051, 1053 (8th Cir. 2000). Because this matter arises under diversity jurisdiction, the court must apply South Dakota law to determine if the documents are privileged or whether a privilege has been waived. Under South Dakota law, a client may assert the attorney-client privilege to prevent disclosure of confidential communications made between the client and the

13

client's attorney for the purpose of facilitating the rendition of professional legal services. *See* SDCL § 19-19-502. For purposes of this statute, South Dakota law defines "client" as "a person, public officer, or corporation, limited liability company, association, or other organization or entity, either public or private, who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from him[.]" SDCL § 19-19-502(a). And generally, a client has the ability "to prevent any other person from disclosing" privileged communications with the client. SDCL § 19-19-502(b). But the attorney-client privilege "may be waived if the client voluntarily or through his attorney discloses the contents of the communication or advice to someone outside that relationship." *State v. Catch the Bear*, 352 N.W.2d 640, 647 (S.D. 1984).

"The burden of showing entitlement to assert the privilege rests with [the] claimant." *Id.* at 645. The South Dakota Supreme Court has not addressed the situation presented by the facts of this case. Thus, the court will rely on persuasive authorities from other jurisdictions that align with South Dakota's privilege law.

## I.      Whether Collateral Estoppel Precludes Relitigation of the Issue

Deck argues that the dissolution court previously decided the issue presented here. Docket 89 at 2; Docket 95 at 6. In a December 2015 memorandum order and while the divorce action was pending, the dissolution court found that "Deck has acted as [Kisting's] personal attorney in business matters and as an attorney for Sovereign, which [Kisting] owns and operates."

14

Docket 90-1 at 9. The court concluded that the communications between Kisting, her divorce attorneys, and Deck were privileged and work product. *Id.* Thus, the dissolution court denied Nylen's motion to compel and noted its specific findings on the issue of privilege as to each document that Kisting had submitted for in-camera review. *Id.* at 10, 25.[8]

The dissolution court issued its oral order on the division of property on April 5, 2016.[9] Then in July 2017, a hearing was held on various motions in the dissolution proceedings. *See* Docket 78-1 (transcript of hearing). At this stage, Kisting had transferred all of her interest in Sovereign to Nylen. Nylen had asked Kisting to sign an authorization directing third parties, including Deck, to give Nylen the communications and documents of Sovereign. *Id.* at 11. The dissolution court questioned whether Kisting had "any authority at this point to waive anything" because the privilege belongs to the corporation. *Id.* at 13. Kisting contended that the authorization was too broad under the dissolution court's supplemental decree. *Id.* at 16-17.

---

[8] As to any communications between Kisting and Deck that Kisting did not include in the privilege log that she submitted to the dissolution court in 2015, Kisting has waived the ability to assert a personal privilege over such communications here.

[9] The privilege does not apply to any communications that occurred between Kisting and Deck after the dissolution court ordered Kisting to transfer her interest in Sovereign to Nylen because such conversations were no longer confidential communications between Kisting as an officer of Sovereign (client) and an attorney. Deck testified that he represented Sovereign as corporate counsel. So if Kisting was no longer an officer, their communications were no longer confidential. *See Dakota, Minn. & E. R.R. Corp. v. Acuity*, 771 N.W.2d 623, 637 (S.D. 2009).

Nylen's attorney explained that Nylen wanted Kisting to sign the authorization in order to speed up the process because Sovereign was entitled to Sovereign's documents. *Id.* at 25. The court then noted, "I don't think I can address your issue today. I understand what you're saying, but I don't think I'm in a position to address it either in terms of what's in front of me or under paragraph nine of the agreement." *Id.* at 26. The dissolution court then issued an order stating that Kisting was not required to execute the authorization because it was beyond paragraph 9 of the supplemental judgment. Docket 90-14.

"Collateral estoppel is a legal doctrine that 'bar[s] the relitigation of factual or legal issues that were determined in a prior . . . court action' and applies to bar relitigation in federal court of issues previously determined in state court." *In re Scarborough*, 171 F.3d 638, 641 (8th Cir. 1999) (quoting *In re Miera*, 926 F.2d 741, 743 (8th Cir. 1991)); *see also* 28 U.S.C. § 1738 (stating that state court judicial proceedings "shall have the same full faith and credit" in federal courts as they have in the state court from which they are taken). The court looks to the substantive law of the forum state. *In re Scarborough*, 171 F.3d at 641. Because the dissolution court is a South Dakota court, this court must apply South Dakota law to resolve the collateral estoppel issue.

South Dakota has adopted a four-part test to determine collateral estoppel:

> (1) Was the issue decided in the prior adjudication identical with the one presented in the action in question?
> (2) Was there a final judgment on the merits?

(3) Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?
(4) Did the party against whom the plea is asserted have a full and fair opportunity to litigate the issue in the prior adjudication?

*Hamilton v. Sommers*, 855 N.W.2d 855, 866 (S.D. 2014) (quoting *Estes v. Millea*, 464 N.W.2d 616, 618 (S.D. 1990)).

The court finds that collateral estoppel does not apply here. First, the issue decided in the dissolution court's December 2015 order is not identical to the one presented here. The dissolution court ruled on Kisting's personal privilege before the divorce was finalized and before the court ordered Kisting to transfer her interest in Sovereign to Nylen. Thus, the dissolution court's December 2015 order did not address whether Kisting's personal privilege prevents Nylen, the owner of Sovereign, from obtaining Sovereign's corporate documents in Deck's possession.

Second, the dissolution court implied that Kisting's personal privilege no longer attached to Sovereign's documents during the July 2017 hearing.

> [Counsel for Nylen]: [Kisting] is not the owner of those privileges. Sovereign was and Sovereign has been transferred now. And we need to know what was going on in Sovereign and we don't have that ability, so we need to figure out a way to effectuate your order to get us the documents that we need.
> [Court]: So isn't that the case then? I mean, it belongs to the corporation right, the –
> [Counsel for Nylen]: Indeed it does.
> [Court]: The privilege? So does Miss Kisting have any authority at this point to waive anything?

Docket 78-1 at 13.

Nylen and Kisting did not litigate the issue that is presented here—whether Sovereign's corporate documents are protected by Kisting's attorney-

client privilege even after the dissolution court ordered Sovereign to be transferred to Nylen—at the July 2017 hearing. The dissolution court was clear that Kisting would not be ordered to sign the authorization proposed by Nylen because it was broader than what was required under the supplemental decree. Nylen did not raise in a motion the issue of whether the corporation controlled the privilege after the transfer of the corporate stock; rather, the parties discussed it at the hearing without any briefing. Thus, the parties did not fully litigate the issue presented here and the dissolution court did not decide the issue. In summary, collateral estoppel does not bar litigation of the issue presented here.

## II.     General Rule: Corporation Controls the Privilege

Deck acknowledges the general rule that when a corporation changes ownership, the corporation's documents and privilege follow the corporation. *See* Docket 70 at 9 (oral argument of Deck at telephonic hearing). Deck argues, however, that the unique facts of this case fall within the exception found in *Tekni-Plex, Inc. v. Meyner & Landis*, 674 N.E.2d 663 (N.Y. 1996), *Facebook, Inc. v. ConnectU, Inc.*, 2009 WL 10680755 (N.D. Cal. Sept. 2, 2009), and *Chambers v. Gold Medal Bakery, Inc.*, 983 N.E.2d 683 (Mass. 2013). Docket 56 at 10-11. Kisting takes the same position as Deck (Dockets 92, 97), while Sovereign argues that the general rule applies. Docket 44.

The United States Supreme Court has noted that it is "well established . . . that the attorney-client privilege attaches to corporations as well as to individuals." *Commodity Futures Trading Comm'n v. Weintraub*, 471

U.S. 343, 348 (1985) (citing *Upjohn Co. v. United States*, 449 U.S. 383 (1981)). But because a corporation is an entity, it must act through its agents. *Id.* Thus, actions related to the corporation's attorney-client privilege "must necessarily be undertaken by individuals empowered to act on behalf of the corporation." *Id.* The corporate privilege covers communications between counsel and management, and corporate officers can waive the corporation's privilege. *Id.*

> The parties also agree that when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well. New managers installed as a result of a takeover, merger, loss of confidence by shareholders, or simply normal succession, may waive the attorney-client privilege with respect to communications made by former officers and directors. Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties.

*Id.* at 349.

Thus, the court begins with the general rule that any attorney-client privilege of Sovereign passes to Sovereign's new management. So under this general rule, the authority to assert the attorney-client privilege over communications between Kisting, the past 75% owner and president of Sovereign, and Deck, the past general corporate counsel for Sovereign, belongs to Sovereign. It is Kisting and Deck's burden to establish that the general rule summarized in *Weintraub* does not apply in this case.

## III. Bevill Test

Because corporations must act through their agents, one privilege-related issue is whether a corporate officer communicates with corporate

counsel as an officer of the corporation or individually. "[C]ourts will assume that any consultations were in a corporate not an individual capacity." Edna Selan Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* 203 (6th ed. 2017). *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.* developed a five factor test that many courts have adopted to determine if a corporate officer consulted the corporate attorney in a personal capacity, rather than in the officer's corporate capacity. *Bevill*, 805 F.2d 120 (3d Cir. 1986).

The issue in *Bevill* focused on whether individual directors could assert an attorney-client privilege to prevent corporate communications with corporate counsel from disclosure when the corporation's privilege had been waived. *Id.* at 124. The district court in *Bevill* adopted a five-factor test to determine if corporate officers can assert a personal privilege over communications with corporate counsel. *Id.* at 123. Subsequently adopted by many other courts, the *Bevill* five-factor test provides:

(1)    The employee seeking to assert a personal attorney-client privilege with respect to communications with corporate counsel must show that the employee approached counsel for the purpose of seeking legal advice.

(2)    The employee must further show that he or she made clear to counsel that the employee was seeking legal advice in the employee's individual, rather than representative, capacity.

(3)    The employee must demonstrate that the corporate counsel, knowing that a possible conflict could arise, nonetheless saw fit to communicate with the employee in the employee's individual capacity.

(4)    The employee must prove that the conversations with corporate counsel were confidential.

(5)    The employee must show that the substance of the conversations with corporate counsel did not concern matters within the company or the general affairs of the company.

Epstein, *supra*, at 205.

Under this test, the district court in *Bevill* determined that communications between the corporate officers and attorneys were corporate in nature, not personal. *Bevill*, 805 F.2d at 123. On appeal, the officers argued that "because their personal legal problems were inextricably intertwined with those of the corporation, disclosure of discussions of corporate matters would eviscerate their personal privileges." *Id.* at 124. The Third Circuit, construing this argument as one for a "blanket privilege" over communications with counsel, rejected the officers' position because it ignored the general rule discussed in *Weintraub* and was contrary to public policy. *Id.* at 124-25. Citing *Weintraub*, the Third Circuit noted that a corporate official cannot prevent the corporation from waiving its privilege over communications with corporate counsel about corporate matters. *Id.* at 125. The court then approvingly discussed the five-factor test that was adopted and applied by the district court and affirmed the order of the direct court. *See id.* ("The test adopted by the district court does not invade the personal privilege of the officers because they do not have an attorney-client privilege with regard to communications made in their role as corporate officials.").

While neither the Eighth Circuit nor the South Dakota Supreme Court have addressed the *Bevill* test, several other circuit courts of appeals have adopted *Bevill* to determine privilege issues involving corporate officers. *See United States v. Graf*, 610 F.3d 1148, 1157 (9th Cir. 2010); *In re Grand Jury Subpoena*, 274 F.3d 563, 571 (1st Cir. 2001); *In re Grand Jury Subpoenas*, 144

F.3d 653, 659 (10th Cir. 1998); *United States v. Int'l Bhd. Of Teamsters*, 119 F.3d 210, 215 (2d Cir. 1997). And the *Bevill* test was adopted by a district court within the Eighth Circuit, namely *United States v. Dose*, 2005 WL 106493, at *16 (N.D. Iowa Jan. 12, 2005).

Deck has taken the position that *Bevill* does not apply to this case given its unique facts. *See, e.g.*, Docket 96 at 4-6. In support of his position, Deck attempts to distinguish *Bevill* from this case based on *Bevill*'s facts involving an officer's involvement in alleged criminal activity and the corporation's filing for Chapter 7 bankruptcy. *Id.* at 5. But the *Bevill* factors are not tailored to the unique facts giving rise to the *Bevill* litigation. The *Bevill* test aligns with general principles underlying attorney-client privilege. First, it keeps the burden on the corporate officer to show why the general rule summarized in *Weintraub* should not apply to a particular set of facts. Second, the test balances the interests of both the corporation and corporate officers. As explained by the Ninth Circuit Court of Appeals,

> There are strong policy reasons to adopt the *Bevill* test. As noted above, any time a corporation retains counsel, counsel will have to talk to individual employees to represent the company effectively. The *Bevill* test responds to this reality by ensuring that a corporation is free to obtain information from its officers, employees, and consultants about company matters and then control the attorney-client privilege, waiving it when necessary to serve corporate interests. The test also preserves the individual's ability to claim a personal attorney-client privilege when the individual makes clear he or she is seeking personal legal advice and the communications relate to personal legal affairs, not to the company's business.

*Graf*, 610 F.3d at 1160-61.

Deck also argues that even if *Bevill* applies, the dissolution court's previous rulings dictate what documents Nylen should receive, and Sovereign's current motion to compel is a collateral attack on the dissolution court's rulings. Docket 95 at 6. After reviewing relevant materials from the dissolution proceeding, the court finds that the dissolution court's rulings do not "make the *Bevill* analysis irrelevant" here as Deck contends. *See id.* And because the court has found that collateral estoppel does not apply, the court concludes that a *Bevill* factor analysis is appropriate.

Kisting argues that the communications between her, her divorce attorneys, and Deck are privileged under *Bevill* "because Deck was acting as Kisting's individual counsel rather than as corporate counsel to Sovereign." Docket 97 at 2. She appears to generally assert a blanket privilege over any documents submitted to this court for an in-camera review by Deck that involve her dissolution counsel. *Id.*

### A. Factor One: Employee Approached Corporate Counsel for Legal Advice

Under the first factor, Kisting must show that she approached Deck for the purpose of seeking legal advice. *Bevill*, 805 F.2d at 123. Kisting argues that a review of the documents submitted for an in-camera review shows this factor is easily met. Docket 92 at 6-7. At the evidentiary hearing, Kisting testified that she approached Deck to seek legal advice (Docket 81 at 53) and she retained Deck and Hindman to represent Sovereign in the Northwest Bank litigation (*id.* at 41).

**B.     Factor Two: Employee Made Clear to Counsel that She Sought Personal Legal Advice**

The second *Bevill* factor requires the employee to show that she made it clear to corporate counsel that she was seeking legal advice in her individual, rather than representative, capacity. *Bevill*, 805 F.2d at 123. Kisting argues that she has met this factor because she gave her dissolution attorneys permission to communicate with Deck about Sovereign as a marital asset, and "it should have been apparent to Deck that much of the legal advice sought from him was to assist Kisting personally in the dissolution action." Docket 92 at 7. But the testimony of both Kisting and Deck plainly leads to the opposite conclusion.

Deck was hired by Sovereign as general corporate counsel and provided legal advice to Kisting as president of Sovereign. While he handled personal matters for both Nylen and Kisting, he testified that he never represented Kisting in the divorce proceedings. Deck takes the position that Sovereign's interests and Kisting's personal interests merged, but the identity of his client was clear to Deck. *See id.* at 131 ("But did I ever represent [Kisting] personally? No. . . . I represented the company, and her as an officer of the company, yes."). Similarly, Kisting testified that she approached Deck for legal advice as the president of Sovereign, and if she needed advice related to her divorce, she contacted her divorce attorneys.

In her brief, Kisting argues that the fact that Kisting's divorce attorneys were communicating with Deck should have alerted Deck that Kisting sought individual legal advice. Docket 92 at 7. The court finds this argument

24

unpersuasive. Under *Bevill*, and consistent with the general rule that it is the individual's burden to establish that a personal privilege applies, Kisting must have made it clear to Deck that she was seeking individual advice. Neither Deck nor Kisting has provided the court with authority to support the position that it is a corporate attorney's job to keep track of which hat an officer of the corporation is wearing in each communication with the attorney. Thus, Kisting did not make it clear to Deck that she sought personal legal advice from Deck.

### C. Factor Three: Employee Demonstrates that Corporate Counsel Communicated with Individual, Despite Possible Conflict

Under the third *Bevill* factor, Kisting must show that Deck communicated with Kisting individually, despite knowing that a possible conflict between Kisting and Sovereign could arise. *Bevill*, 805 F.2d at 123. Kisting argues that this factor is met because the interests of Sovereign and Kisting were aligned, as Kisting and Sovereign both sought to protect Sovereign's assets from Northwest Bank, and thus Deck did not have a conflict of interest. Docket 92 at 8-9. But whether Deck actually had a conflict is not the issue. The real question is whether Deck found communications with Kisting in her individual capacity, or her divorce attorneys, appropriate despite a potential conflict with Sovereign's corporate interests in the future.

While their testimony does not directly address this factor, Deck did write a letter to Nylen in April 2014, where he noted that he was conflicted in representing either Nylen or Kisting in the divorce. *See* Docket 75, Exhibit 5. Thus, Deck anticipated a potential conflict of interest between Kisting, Nylen, and their business entities. Deck's position in his letter to Nylen undermines

Kisting's argument that the third *Bevill* factor is met. Deck knew a conflict could arise, which is why he did not represent Kisting personally.

### D. Factor Four: Employee Must Show Conversations were Confidential

The fourth factor requires Kisting to show that her conversations with Deck were confidential. *Bevill*, 805 F.2d at 123. Kisting testified that she believed her communications with Deck were confidential. Deck testified that he "owed a duty of confidentiality to the principal, [Kisting]." Docket 81 at 124.

### E. Factor Five: Employee Must Show Conversations did not Concern General Affairs of Company

Finally, Kisting must show that the substance of her conversations with Deck did not concern the general affairs of Sovereign. *Bevill*, 805 F.2d at 123. Kisting argues this factor is met because many of the communications between Kisting, her divorce attorneys, and Deck concerned Kisting's personal rights and responsibilities regarding Sovereign as a marital asset in the divorce rather than Sovereign's corporate affairs. Docket 92 at 10.

> The fifth prong of . . . *Bevill* . . . only precludes an officer from asserting an individual attorney client privilege when the communication concerns the corporation's rights and responsibilities. However, if the communication between a corporate officer and corporate counsel specifically focuses upon the individual officer's personal rights and liabilities, then the fifth prong . . . can be satisfied even though the general subject matter of the conversation pertains to matters within the general affairs of the company.

*In re Grand Jury Proceedings*, 156 F.3d 1038, 1041 (10th Cir. 1998).

While Kisting testified that her communications with Deck concerned the general affairs of Sovereign, she asks the court to review each individual

communication on the privilege log to determine which communications involved Kisting's rights and responsibilities and which involved Sovereign's general affairs. Docket 92 at 9-10. The court finds that communications between Kisting, or her divorce attorneys, and Deck related to Sovereign's litigation with Northwest Bank, such as Deck's advice that Northwest Bank waived its claim to the equipment proceeds, concern the general affairs of Sovereign—not Kisting's personal rights. Sovereign retained Deck and Hindman to represent Sovereign in the litigation with Northwest Bank. The only exception to this is the personal federal tax liability advice that Deck provided to Kisting. These communications do not involve the general affairs of Sovereign.

### F.     Other Factors for Closely-Held Corporations

Courts also generally apply the default assumption—that the corporation is the client, not the individual corporate officer—to closely held corporations. *See* Epstein, *supra*, at 210. In addition to the *Bevill* factors, courts can consider factors such as who paid the attorney's legal bills, whom the attorney understood to be the client, and whether the attorney communicated with only the corporate officer or also with other employees. *See MacKenzie-Childs, LLC v. MacKenzie-Childs*, 262 F.R.D. 241, 242 (W.D.N.Y. 2009) (analyzing these three issues); *United States v. Okun*, 281 F. App'x 228, 230-31 (4th Cir. 2008) (affirming district court's finding that the "subjective belief" of the sole shareholder and CEO of the corporation that corporate counsel was his

personal attorney was not credible or reasonable in light of corporate counsel's contrary testimony).

Here, Kisting testified that she paid Deck's attorney fees as counsel for Sovereign and Judge Jensen did not allow her to be reimbursed for attorney fees related to the Northwest Bank litigation. But Kisting also noted that before the divorce, Sovereign's legal fees were paid out of Sovereign or Hepar BioScience's bank account. At some point, a receiver was appointed in the dissolution proceeding, and the receiver made the legal fee payments on behalf of Kisting and Nylen.

Deck testified that he understood Sovereign to be the client here and he never personally represented Kisting in her divorce. Deck communicated with Nylen as an officer of Sovereign before the divorce proceedings began, but he primarily communicated with Kisting. But Sovereign did not have any officers other than Nylen or Kisting and only two employees who drove Sovereign trucks.

### G.   Balancing all Factors

The court finds that Kisting communicated with Deck about her personal federal tax liability in a personal capacity, so these communications are privileged. But with regard to the remainder of the communications, after balancing all five *Bevill* factors, the court finds that Kisting has not established a "clear showing" that she consulted with Deck in her individual capacity, rather than her corporate capacity. There is no evidence that Kisting approached Deck to explicitly seek personal legal advice while there is

28

abundant testimony that Deck represented Sovereign as corporate counsel and gave Kisting advice as an officer of Sovereign. And while Deck argues that Kisting's interests and Sovereign's interests were "inextricably intertwined" (Docket 56 at 11), the Third Circuit Court of Appeals rejected that very argument in *Bevill* because it was contrary to the general rule discussed in *Weintraub. See Bevill*, 805 F.2d at 124. Thus, the court finds that under the *Bevill* analysis, Kisting has not clearly shown that she, as a corporate officer, sought personal legal advice from Deck, corporate counsel, on the remainder of the communications. As such, the court continues with the additional arguments presented by the parties, keeping in mind that the general rule in *Weintraub* is still the default assumption.

## IV. Whether Mark Nylen was Adverse to Sovereign during the Northwest Bank Litigation

Deck and Kisting argue that the general rule of *Weintraub* does not apply in this case because Kisting and Sovereign were adverse to Nylen when the privileged communications took place. *See* Docket 56 at 11-15, Docket 92 at 12, Docket 95 at 18, Docket 97 at 3. In support of their adversity argument as an exception to the general rule, Deck and Kisting rely on *Tekni-Plex, Inc. v. Meyner & Landis*, 674 N.E.2d 663 (N.Y. 1996), *FaceBook, Inc. v. ConnectU, Inc.*, 2009 WL 10680755 (N.D. Cal. Sept. 2, 2009), and *Chambers v. Gold Medal Bakery, Inc.*, 983 N.E.2d 683 (Mass. 2013). Sovereign acknowledges that Nylen and Kisting were adverse to each other, but does not agree with Deck's

argument that Nylen was adverse to Sovereign during the relevant time period. *See* Docket 70 at 12; Docket 94 at 10.

In *Tekni-Plex*, Tang was the sole shareholder, president, CEO, and sole director of Tekni-Plex during the relevant time period. 674 N.E.2d at 665. Meyner and Landis (M&L), a law firm retained by Tekni-Plex for many years, represented Tekni-Plex on various legal matters and represented Tang individually on personal matters. *Id.* In a merger agreement with TP Acquisition, Tang agreed to sell Tekni-Plex to TP Acquisition, and M&L represented Tekni-Plex and Tang personally during that process. *Id.* In the merger agreement, Tang agreed to indemnify TP Acquisition for any losses resulting from breaches of warranty or representations. *Id.* TP Acquisition then commenced an arbitration proceeding against Tang, alleging breach of representations and warranties. *Id.* After Tang retained M&L to represent him, TP Acquisition moved to disqualify the law firm and moved for M&L to give all its Tekni-Plex files pre-merger to TP Acquisition. *Id.* at 666.

The New York Court of Appeals concluded that M&L should be disqualified from representing Tang in the arbitration, and the authority to assert the attorney-client privilege over confidential communications between Tekni-Plex and M&L pre-merger passed to TP Acquisition—the new management. *Id.* But the court noted that TP Acquisition could not assert the privilege over communications between M&L and Tekni-Plex or Tang individually *about* the acquisition because "Tekni-Plex and Tang were joined in an adversarial relationship to [TP] Acquisition" during the acquisition. *Id.*

30

(emphasis added). The court also found that TP Acquisition was not entitled to M&L's confidential communications about its representation of Tekni-Plex during the acquisition. *Id.* The court then discussed the Code of Professional Responsibility under New York law to determine whether M&L should be disqualified as counsel. *Id.* at 667-68.

Tang and M&L argued that TP Acquisition's purchase of Tekni-Plex did not transfer the attorney-client privilege under the general rule because the acquisition was a transfer of assets and Tekni-Plex ceased to exist after the merger. *Id.* at 668. In response, the court stated:

> *Weintraub* establishes that, where efforts are made to run the pre-existing business entity and manage its affairs, successor management stands in the shoes of prior management and controls the attorney-client privilege with respect to matters concerning the company's operations. It follows that, under such circumstances, the prior attorney-client relationship continues with the newly formed entity.
>
> By contrast, the mere transfer of assets with no attempt to continue the pre-existing operation generally does not transfer the attorney-client relationship.

*Id.* The court then noted that the old Tekni-Plex, despite expiring after the merger, did not cease in substance. *Id.* at 669. Rather, Tekni-Plex's business operations continued under its new management—TP Acquisition. *Id.* And thus, the court found that control of the privilege over communications pre-merger indeed passed to TP Acquisition. *Id.*

The court next analyzed the communications related to the merger itself and why TP Acquisition did not assume control of the privilege over those communications, which is the reasoning Deck relies on here. *Id.* at 671; *see*

31

*also* Docket 56 at 13. The court reasoned that the parties' merger agreement "contemplated that, in any dispute arising from the merger transaction, the rights of the acquired corporation, old Tekni-Plex, relating to the transaction would remain independent from and adverse to the rights of [TP Acquisition]." *Tekni-Plex*, 674 N.E.2d at 672. Thus, while citing the purposes underlying the attorney-client privilege, the court's ruling was largely based on "this particular transaction and the structure of the underlying agreement." *Id.* The court lastly noted that its decision did not prevent TP Acquisition from obtaining confidential documents for which the privilege had been waived through the discovery process. *Id.*

Similarly, on a motion to disqualify counsel based on the California Rules of Professional Conduct, the court in *Facebook, Inc. v. ConnectU, Inc.* relied on the reasoning of *Tekni-Plex* in determining whether a law firm that previously represented co-defendants (ConnectU and the Founders) could continue to represent one of the defendants (the Founders) in the same litigation. 2009 WL 10680755, at *2, *10-11 (N.D. Cal. Sept. 2, 2009). The Founders had owned ConnectU. *Id.* at *1. As part of the settlement agreement earlier in litigation, Facebook became the sole shareholder of ConnectU and retained new management. *Id.* at *2. ConnectU's new management retained new counsel that sought to disqualify previous counsel from continuing to represent the Founders because such continued representation would be a conflict of interest. *Id.* In opposition, the Founders argued that Facebook, through its

ownership of ConnectU, was trying to "cripple" the Founders, its long-time litigation adversary. *Id.*

The court concluded that the Founders could continue in the litigation with new attorneys, but ConnectU would be harmed if its former attorneys took a position adverse to it by continuing to represent the Founders. *Id.* at *9.

> More importantly, the public would be assured that should they seek joint representation in a matter, with the inherent prospect that a conflict of interest could arise, they could, nevertheless, have full trust and confidence that the attorney would never become an advocate for their adversary in the same or substantially related matter.

*Id.* Thus, the court granted ConnectU's motion to disqualify the Founders' counsel. *Id.*

ConnectU also moved for an order directing the previous law firm to turn over its client files on ConnectU, which the Founders opposed, arguing that "[t]he guise that [the] files somehow belong to ConnectU is a smokescreen to cripple Facebook's adversaries by peering into their counsel's attorney-client and work product materials." *Id.* at *9 (alterations in original). The court weighed the competing interests, first noting that ConnectU has a separate legal identity with interests, rights, and liabilities that are separate from either of its owners—the Founders or Facebook. *Id.* "As the current principal of ConnectU, Facebook now has the right to examine [ConnectU's legal files] so that it can competently conduct the business of ConnectU." *Id.* On the other hand,

> [T]he representation collectively received by the Founders and ConnectU related to the litigation against their mutual adversary,

33

Facebook. As a consequence, it is likely that documents were generated on behalf of both the Founders and ConnectU which reflect privileged communications between the Founders and their counsel, the Founders' litigation positions, and other confidential information. These documents likely include confidential information relating to the Settlement Agreement now in dispute. To require [the law firm] to hand over all of ConnectU's client files would necessarily cause the Founders to expose confidential information to Facebook that relates to the exact subject of this litigation, potentially prejudicing the Founders on appeal and thereafter.

*Id.* (footnote omitted).

The court then relied on the reasoning in *Tekni-Plex* "because it reflects an appropriate balance between the legitimate competing interests at play." *Id.* at *10. Thus, the court concluded that ConnectU was entitled to access its own general business documents, but declined to order the law firm to turn over files related to ConnectU's litigation against Facebook. *See id.* at *11("To require a handover of all ConnectU files would be to expose to the Founders' adversary all of the [sic] their relevant litigation documents.").

Finally, in *Chambers v. Gold Medal Bakery, Inc.*, the Supreme Judicial Court of Massachusetts concluded that the interests of plaintiffs, who were two of the four board members and 50% shareholders of a closely-held corporation, were adverse to the interests of the closely-held corporation and the other two board members who also ran the daily operations of the corporation as officers. 983 N.E.2d at 689. Thus, the court found "on the narrow facts of [the] case," that previous documents generated by the corporation's law firm in anticipation of or related to litigation with the plaintiffs were protected by the attorney-client privilege and work product doctrine. *Id.*

Here, Deck and Kisting argue that like *Tekni-Plex* and *ConnectU*, Deck properly turned over all Sovereign documents that relate to Sovereign's general business but requiring Deck to turn over all communications between Deck and Kisting during a time that Sovereign was adverse to Nylen is a " 'smokescreen' to cripple Mark Nylen's wife Mary Ellen by peering into documents that expressly relate to their divorce." Docket 56 at 14-15.

The court notes that Deck and Kisting's adversity argument is based on a theory that Nylen took positions in the dissolution proceeding and previous litigation that aligned with Northwest Bank's interests, which were adverse to Sovereign's interests. First, the court does not find the issue of whether Nylen was adverse to Sovereign as clear-cut as Deck and Kisting argue it is.[10] *See Chambers*, 983 N.E.2d at 693 ("We stress that no one factor or combination of factors is dispositive in determining when a director has interests adverse for attorney-client privilege purposes, particularly in the unique context of a close corporation."). "The analysis [of adversity] is fact specific and necessarily depends upon the circumstances of each case." *Id.* at 693-94 (quotation omitted). The facts here are different from both *Tekni-Plex* and *ConnectU*.

In *Tekni-Plex*, for instance, the court noted that old Tekni-Plex's rights related to disputes arising from the merger transaction were independent and

---

[10] In *Chambers*, the court noted that the evidence showing that plaintiffs had sued the corporation frequently in the past was "[o]f great significance" in determining that plaintiffs' interests were adverse to the corporation. *Chambers*, 983 N.E.2d at 694. There is no evidence here that Nylen previously sued Sovereign.

adverse to the rights of the buyer, TP Acquisition. *Tekni-Plex*, 674 N.E.2d at 671. And the *Tekni-Plex* case stemmed from the merger transaction itself. *Id.* Analogizing the facts here to *Tekni-Plex*, Nylen and Kisting's dissolution proceeding would be this case's merger transaction because the adversity argument arises from the dissolution proceeding. Deck and Kisting argue that allowing Sovereign to obtain the documents at issue will allow Nylen to obtain documents related to Nylen and Kisting's divorce. And it is Kisting's personal privilege related to the divorce that she seeks to assert now. In *Tekni-Plex*, the parties argued over documents related to the merger negotiations, the event from which adversity stemmed. *Tekni-Plex*, 674 N.E.2d at 671. But this is why *Tekni-Plex* is distinguishable. The current dispute did not arise because of the divorce. Sovereign is not seeking documents from the dissolution proceeding—rather, Sovereign is seeking Sovereign documents that happen to include communications related to the dissolution proceeding. Under the reasoning of *Tekni-Plex*, adversity would be more applicable in a dispute arising from the dissolution proceeding itself.

And in *ConnectU*, the court did not order the law firm to turn over all ConnectU files because such an action would expose the Founders' adversary to all of the Founders' litigation documents from litigation with that adversary. *ConnectU*, 2009 WL 10680755, at *11. The parties were disputing the settlement agreement that transferred ConnectU from the Founders to Facebook. *Id.* And the law firm had jointly represented both the Founders, previous owners, and the company, ConnectU. *Id.* In contrast, Deck did not

jointly represent both Sovereign and Kisting. And Sovereign is not suing on the very agreement that transferred Sovereign from Kisting to Nylen.

## V.    Whether the Common Interest Privilege Applies

Kisting next argues that South Dakota's common interest privilege protects "many" of the communications between Deck and Kisting. Docket 92 at 19. Sovereign argues that Kisting has misconstrued the common interest privilege. Docket 94 at 14.

The common interest privilege protects communications between the client "or his lawyer . . . to a lawyer . . . representing another party in a pending action and concerning a matter of common interest therein . . . ." SDCL § 19-19-502(b)(3). In other words, if a lawyer for Sovereign and a lawyer for Kisting communicated about a pending action where Sovereign and Kisting had a common interest, the privilege would apply. Because the facts here are unique, Kisting argues that the common interest privilege should apply to communications between Deck and Kisting's divorce lawyers about Sovereign in the dissolution action, even though the statute requires each lawyer to represent a party in a pending action. Docket 92 at 20. In response, Sovereign argues that one party to the joint representation—here Kisting—cannot invoke the common interest privilege against the other party to the joint representation—here Sovereign. Docket 94 at 14.

The court finds that the common interest privilege does not apply. Sovereign was not a party to the dissolution proceeding. Thus, the plain language of the statute does not apply to conversations between Sovereign's

lawyer and Kisting's divorce lawyers. *See Catch the Bear*, 352 N.W.2d at 646-47

(noting that in South Dakota "privileges created by statute are to be strictly

construed to avoid suppressing otherwise competent evidence."). Kisting argues

that the dissolution court would have allowed Sovereign to appear in the

dissolution proceeding after Northwest Bank filed its notice of appearance in

the dissolution, but Sovereign instead "chose to speak through Kisting's

dissolution lawyers[.]" Docket 92 at 20. The court does not find this argument

persuasive because even if Sovereign had noticed its appearance in the

dissolution action, Kisting would not be able to later assert the common

interest privilege against Sovereign.

## CONCLUSION

Under the general rule, any communications between Kisting as the

previous owner of Sovereign and Deck, corporate counsel for Sovereign, were in

a corporate rather than an individual capacity. Kisting and Deck, as the parties

claiming an attorney-client privilege over Sovereign documents and

communications with Deck, have the burden of showing a privilege applies.

The court concludes that Sovereign is not estopped from seeking the

communications between Kisting, her divorce attorneys, and Deck because the

dissolution court did not decide the issue presented here. Kisting and Deck

have failed to show that Deck's communications were with Kisting in a

personal capacity under the *Bevill* test. Regarding adversity, the court

concludes that this case is distinguishable from the adversity cases cited by

Deck. Kisting has also failed to show that the common interest privilege applies here. Thus, the general rule on corporate privilege applies.

Any documents in Deck's possession that relate to Sovereign as a corporation must be produced to Sovereign under the general rule that a corporation's privilege belongs to the corporation, not the individual officers. The only exception is that any communications between Deck and Kisting related to Kisting's personal federal tax liability are privileged and not relevant to Sovereign here. The documents that are privileged are: EHH 1st Production Privileged 44-45, 47-49, 51-52, 55-56, and EHH Continuation Privileged 258-59, 310-11, 312-13, 330. Thus, it is

ORDERED that Sovereign's motion to compel (Docket 42) is granted in part and denied in part.

Dated September 17, 2018.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE